**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

J. Krist Schell

      v.                             Civil No. 06-cv-425-JM

Thomas W. Kent

**O R D E R**

    Plaintiff brought suit against defendant asserting claims of breach of contract, unjust enrichment and fraud, stemming from a failed business association between them.  Summary judgment was entered on the breach of contract claims, and a trial on the remaining claims was held, in which plaintiff presented his claim for unjust enrichment to the court and his claim for fraud to the jury.  The jury found for plaintiff on the fraud claim, and awarded plaintiff $76,524.93 in damages, plus attorney's fees.

    Currently before the court are four separate matters.  First is plaintiff's motion for partial award of attorney's fees (document no. 81), to which he is entitled as damages for having prevailed at summary judgment on the breach of contract claims

asserted in counts I and II.  Second is the court's resolution of plaintiff's unjust enrichment claim.  Third, defendant filed a post trial motion seeking judgment as a matter of law or, in the alternative, a new trial (document no. 98).  And fourth is plaintiff's motion for a determination of the amount of attorney's fees to be awarded under the jury's verdict (document no. 101).  Set forth below is my disposition of each of these four matters.

**1.  Plaintiff's Motion for Partial Award of Damages**

Plaintiff won partial summary judgment on his breach of contract claim asserted in counts I and II of the complaint, based on an Indemnification Agreement between plaintiff and defendant.  See Schell v. Kent, No. 06-425-JM, slip op. at 12 (D.N.H. May 9, 2008) ("Sum. J. Order") (document no. 55). Plaintiff prevailed, because defendant had failed to timely answer requests for admissions filed by plaintiff which, as a result, were deemed admitted.  See id. (citing Fed. R. Civ. P. 36(a)(3)).  Among the matters deemed admitted was the existence of an Indemnification Agreement, which provided for plaintiff to be reimbursed for 2/3 of any damages or losses sustained by plaintiff in connection with a Guarantee which plaintiff had

executed.  See id. at 9.  Plaintiff had been sued on the Guarantee in state court and incurred attorney's fees in defense of that action against him.  The state court claim on the Guarantee was dismissed because it was barred by the statute of limitations.  I concluded, however, that the Indemnification Agreement entitled plaintiff to recover 2/3 of the costs incurred in defending the claim on the Guarantee in state court, through its dismissal on June 7, 2005.

Plaintiff has submitted a statement of the costs incurred in the state action, as damages for the indemnification claim which he asserted and won here (document no. 81).

The Indemnification Agreement provided that plaintiff was entitled to two-thirds of his reasonable attorney's fees and costs incurred in connection with claims on the Guarantee. Plaintiff has submitted statements totaling $31,932.42. Defendant "does not object to the hourly fee claimed." (Document no. 86).  He does claim that the fees have not been allocated between the fees covered by the Guarantee and those related to non-guarantee claims.  Defendant, however, has not pointed to a single billing entry that relates to non-guaranteed claims.  I have reviewed the time records and cannot identify any "non-

guarantee" time entries.

The billable hours and rates are reasonable and relate to the claims covered by the Guarantee.  Plaintiff is entitled to judgment on Counts I and II in the amount of $21,288.32.

**2.  Count III – Unjust Enrichment**

Plaintiff brought this action to recover financial losses he sustained from a failed business venture with defendant, in which the pair formed a company, known as Bradley Reed Lumber, LLC ("BRL"), to import and sell high quality lumber from Russia. Plaintiff's tenure with BRL was short-lived, and he was not paid for his contributions to the company when he left it.  In count III of the complaint, plaintiff asserted an unjust enrichment claim, based on defendant's alleged retention of plaintiff's contributions to BRL, which defendant continued to own and operate for several years after plaintiff's departure.

The unjust enrichment claim initially asserted two separate bases for the relief sought.  First, plaintiff claimed that defendant was unjustly enriched because plaintiff was never reimbursed either for $18,587.00 in expenses he incurred on behalf of the company, or for $28,937.93 in capital contributions plaintiff made to the company.  At summary judgment, I found that

4

an oral contract existed between the parties for the return of this same capital and expenses.[1]  Because a contract was found to have existed which covered these same reimbursement claims, plaintiff's counsel conceded that he could not recover them on a quasi-contract basis and abandoned this basis for the unjust enrichment claim.  See Schell v. Kent, No. 06-425-JM, slip op. at 1 (D.N.H. Dec. 10, 2008) ("Unjust Enrichment Order") (document no. 79).  Plaintiff proceeded with his second theory of unjust enrichment, namely that defendant had retained the value of plaintiff's ownership interest in BRL and that plaintiff was entitled to damages related to his losses stemming from his interest in the company.  See id. at 2.

To establish his unjust enrichment claim, plaintiff must have demonstrated that defendant received a benefit which would be unconscionable to retain and which, therefore, equity requires he make restitution to plaintiff for the same.  See Int'l Paper Box Machine Co. v. Paperboard U.S. Indus., No. Civ. 99-184-JD, 2000 WL 1480462, 4 (D.N.H. Feb. 8, 2000) (citing Pella Windows & Doors v. Faraci, 133 N.H. 585, 586, 580 A.2d 732, 732-33 (1990));

---

[1]Although an oral agreement was found to support plaintiff's breach of contract claim asserted in count I, on summary judgment this contract claim was found to be barred by the statute of limitations.  See Sum. J. Order at 12-14.

see also Petrie-Clemons v. Butterfield, 122 N.H. 120, 127, 441
A.2d 1167, 1171-72 (1982).  "Unjust enrichment may exist when an
individual receives a benefit as a result of his wrongful acts,
or when he innocently receives a benefit and passively accepts
it."  Petrie-Clemons, 122 N.H. at 127, 441 A.2d at 1172.  While
this equitable doctrine grants the trial court broad discretion
to award damages according to the exigencies of the particular
case, see Singer Asset Fin. Co. v. Wyner, 156 N.H. 468, 476, 937
A.2d 303, 311 (2007), the doctrine is not animated by some moral
obligation, but rather "there must be some specific legal
principle or situation which equity has established or
recognized" to justify restitution.  Cohen v. Frank Developers,
Inc., 118 N.H. 512, 518, 389 A.2d 933, 937 (1978) (finding no
unjust enrichment where defendant benefitted from plaintiff's
relationship with a third party).  Finally, the basis for any
recovery plaintiff may be entitled to focuses on "the value of
what was actually received by the defendant," not what the cost
to plaintiff was.  Martin v. Phillips, 122 N.H. 34, 38, 440 A.2d
1124, 1126 (1982) (dismissing unjust enrichment claim because
plaintiff's poor services offset the value of the material he had
contributed); see also Pella Windows & Doors, 133 N.H. at 586,

580 A.2d at 732 (1990) (finding no unjust enrichment where defendants' costs far exceeded the value of the benefit received).

The facts here show that plaintiff and defendant had a business relationship that would be recognized in equity as potentially giving rise to restitution if defendant were unjustly enriched by a benefit received from plaintiff.  The evidence demonstrated that the parties had agreed to form a limited liability company, in which their respective member shares were 1/3 for the plaintiff and 2/3 for the defendant.[2]  The evidence also supported plaintiff's position that his 1/3 membership share of the LLC was retained by defendant after plaintiff stopped working for BRL, because he was paid nothing for either the services he had provided or the financial contributions he had

---

[2]The evidence showed that the parties agreed to divvy up the responsibilities of the company and that, at least in the beginning, they followed their plan.  Plaintiff, who held a masters degree in business administration, handled marketing and sales for the company, and managed its books, including billing. Defendant, who had run other businesses and held a masters degree in engineering, ran the operations of the company and was responsible for purchasing inventory, including traveling to Russia where he had contacts in the lumber industry.  The evidence also demonstrated, however, that as early as the middle of 2000, this initial arrangement was not working for a myriad of reasons and that plaintiff began to express a desire to extricate himself from BRL.

made.  The evidence also showed that defendant continued to operate BRL, eventually to his benefit; however, the parties disputed whether defendant in fact benefitted from retaining plaintiff's interest in the company, or whether any benefit received was offset by what plaintiff had not accomplished for the company.  In the end, however, it did not matter whether plaintiff cleared this final evidentiary hurdle, because the evidence established that plaintiff's unjust enrichment claim is barred by the statute of limitations.

A claim for unjust enrichment is governed by New Hampshire's three year statute of limitations.  See N.H. Rev. Stat. Ann. 508:4, I (1997); see also Singer Asset Fin. Co., 156 N.H. at 477, 937 A.2d at 312 (applying three year statue of limitations to unjust enrichment claim); Coyle v. Battles, 147 N.H. 98, 102, 782 A.2d 902, 906 (2001) (same).  A cause of action arises once all the necessary elements are present, unless the discovery rule tolls the statute of limitations.  See id., 147 N.H. at 101-02, 782 A.2d at 905.  The discovery rule applies a two-part test to determine whether the statute should be tolled:  "[f]irst, a plaintiff must know or reasonably should have known that it has been injured; and second, a plaintiff must know or reasonably

8

should have known that its injury was proximately caused by the conduct of the defendant." Wood v. Greaves, 152 N.H. 228, 232, 876 A.2d 241, 244-45 (2005) (internal quotation omitted). The discovery rule only postpones the running of the statute of limitations until it is reasonable to charge plaintiff with knowing the causal relationship between defendant's conduct and plaintiff's injury. "[T]he discovery rule is not intended to toll the statute of limitations until the full extent of the plaintiff's injury has manifested itself. Rather, that the plaintiff could reasonably discern that he suffered some harm caused by the defendant's conduct is sufficient to render the discovery rule inapplicable." Id., 152 N.H. at 233, 876 A.2d at 245 (internal quotation omitted).

Plaintiff commenced this action on November 16, 2006; therefore, the actions giving rise to his claim for unjust enrichment either had to have occurred, or had to have not been reasonably discoverable until, after November 16, 2003 to fall within the three year statute of limitations. The evidence adduced at trial, however, readily demonstrated that plaintiff either knew, or reasonably should have known, about defendant's retention of plaintiff's contribution to BRL well before November

17, 2003, the date on which the statute of limitations began to
run.  There are several facts which support this conclusion.

First, the undisputed evidence established that on February
22, 2001, defendant called plaintiff to inform plaintiff that he
should no longer be affiliated with BRL, and that plaintiff
accepted that decision.  Both plaintiff and defendant gave
consistent testimony about the content of the February 22, 2001
telephone call.  At that point, plaintiff knew he was walking
away from the company and leaving it in defendant's hands.

Second, plaintiff's understanding of the significance of his
agreement to leave BRL is illustrated by the documents which
purported to evidence the terms of his departure.  See Pl.'s Exs.
10 & 11.  Plaintiff sent defendant a letter, dated February 22,
2001, in which plaintiff "resign[ed] all offices and
responsibilities" of his position at BRL and "relinquish[ed] all
equity claims upon all assets of BRL, also to include any future
revenue due BRL," in exchange for defendant's issuance of a
$50,000 note, to compensate plaintiff for "equity contributed and
expenses incurred" on behalf of BRL.  See Pl.'s Ex. 10.  An
attorney, Marc Lane, then sent defendant a letter, dated March 6,
2001, which transmitted a Settlement Agreement and a Release.

See Pl.'s Ex. 11.  Those two documents were intended to enable plaintiff to resign in exchange for repayment of his capital and expenses and to release plaintiff from his obligations on the $250,000, note and Guarantee, given by plaintiff and defendant to Edward Myslik.  See id.  Plaintiff agreed to relinquish all claims against the company, "including, but not limited to, equity claims upon the assets of the Company and claims upon future revenues of the Company," if the Settlement Agreement and Release were executed.  See id., Settlement Agreement ¶ 3.  While none of these documents was ever executed, they explicitly communicate plaintiff's willingness to give up his ownership rights and interests in BRL, and they reveal plaintiff's awareness of the effect of withdrawing from the company.[3]

Third, even if plaintiff was left confused about his role at BRL after defendant refused to execute these departure documents, plaintiff's tax returns for the years 2000 and 2001 provide

_____

[3]Evidence at trial explained that the attorney, Marc Lane, had been plaintiff's former employer and had been retained by plaintiff and defendant for advice about the corporate structure of BRL before it was formed.  See Pl.'s Ex. 3.  The Settlement Agreement and the Release, combined with plaintiff's ongoing relationship with Attorney Lane, all lead to the reasonable conclusion that plaintiff fully understood the legal ramifications of his departure from BRL in February and March 2001, when he agreed to stop actively working for the company.

further evidence that he did not perceive himself as continuing to be involved with BRL, for purposes of determining when he first understood defendant was unjustly benefitting from his contributions to the company without compensating him.  See Def.'s Ex. U.  The tax returns do not reflect any income from BRL or report any losses caused by BRL.  The 2000 tax return reports that plaintiff worked as a consultant.  Plaintiff testified that he did not report the work he did for BRL in 2000 and 2001 because he did not earn any income from it.  That testimony did not explain, however, why he declined to recognize any losses he sustained, or declined to file a Schedule C or any other tax document to reflect his involvement with BRL.

Plaintiff argues that he would not have given up his ownership interest while simultaneously remaining liable for the corporate debt to Myslik; yet the failure to recognize any tax consequences from his work with BRL supports the conclusion that as early as 2001, when his tax return for 2000 was filed, he was disassociating himself from BRL.  This tax treatment also undermines plaintiff's claim that he believed he continued to have an ownership interest in BRL after 2001.  Even though the evidence showed that he had not severed his financial ties to the

company when he left in February 2001, at that time plaintiff knew, or should have known, that he was leaving behind his member's interest in the company with defendant.

Fourth, plaintiff clearly perceived himself as not being part of BRL in September 2001, when he contacted its principal creditor, Edward Myslik, about releasing him from corporate debt which plaintiff had personally guaranteed.  As plaintiff put it:

> I hope that you will reconsider releasing me
> from the guarantee.  After reading the guarantee
> again, since I am no longer a member of Bradley
> Reed (and haven't been paid for any work or
> reimbursed but for a tiny bit of my expenses
> and none of the equity investment), it doesn't
> make sense that I should still be responsible
> for the note.  And since I'm no longer part
> of Bradley Reed, it's not my intent to be
> responsible for any further obligations of the
> company under the guarantee.

Def.'s Ex. D.  This dispels any lingering doubt about when all the necessary elements of plaintiff's unjust enrichment claim were present.

Plaintiff knew in 2001 that he had the basis for an unjust enrichment claim.  He had left BRL without any compensation, despite have contributed both financially and professionally.  He also knew that defendant was continuing to operate the business and would use the contributions plaintiff had given to it, both

in the form of the professional services he had rendered to get the company off the ground and in the form of the capital contributions to and expenses incurred on behalf of the company. Defendant openly retained the benefits plaintiff gave to the business, which plaintiff also clearly understood, or should have understood, that defendant would use in his efforts to turn the business around.  Defendant needed only to have "innocently receive[d] a benefit and passively accept[ed] it," Petrie-Clemons, 122 N.H. at 127, 441 A.2d at 1172, without compensating plaintiff, for the unjust enrichment to have occurred.

While plaintiff may have been defrauded into believing that eventually he would receive some remuneration, and that belief may have caused him to delay pursuing any action against defendant, plaintiff certainly knew that defendant kept his member's interest in BRL in 2001 and, therefore, could have "reasonably discern[ed] that he suffered some harm caused by [] defendant's conduct" in 2001, more than five years before he commenced this action.  Wood, 152 N.H. at 233, 876 A.2d at 245 (internal quotation omitted).  His claim for unjust enrichment, therefore, is barred by the statute of limitations.

14

**3.  Defendant's Motion for Judgment as a Matter of Law,
     or in the alternative for a New Trial (document no. 98)**

Defendant has moved for judgment as a matter of law, or in
the alternative for a new trial, claiming that the jury's finding
of fraud was against the weight of the evidence, requiring either
that the verdict be reversed or a new trial ordered to prevent
injustice.  See Fed. R. Civ. P. 50 & 59.  In support of this
position, defendant makes three arguments.  First, defendant
claims he made no misrepresentation of material fact, on which
plaintiff relied, when he promised he would repay plaintiff when
the company had the money to do so; second, he states that
because he first made this promise in February 2001, plaintiff's
fraud claim is barred by the statute of limitations; and third,
he argues that the damage award must be reduced because it
erroneously included $29,000, the exact sum plaintiff paid Myslik
in settlement of the state court action.

Plaintiff naturally opposes the motion, first contending
that it should be denied because defendant bases his renewed
motion, filed pursuant to Rule 50(b), on a different ground than
he based the oral motion, made pursuant to Rule 50(a), at trial
before the jury verdict.  See Casillas-Diaz v. Palau, 463 F.3d
77, 81 (1st Cir. 2006) (requiring a Rule 50(b) motion to be

limited to the same grounds as the Rule 50(a) motion was); see
also 9 James W. Moore, Moore's Fed. Prac. § 50.43[3] (3d ed.
2008) (explaining that "Rule 50(b) ordinarily bars a renewed
motion on any ground not specifically raised in the pre-verdict
Rule 50(a) motion").  In support of this argument, plaintiff
asserts defendant based his Rule 50(a) motion, made at the close
of the evidence, on the following two statements that plaintiff
alleges constituted the fraud:

> (1)  There was no money in Bradley Reed to pay
>      Schell's expenses and capital contributions.
>
> (2)  Kent told Schell that when he sells assets,
>      he will pay Schell.

See Pl.'s Resp. to Def.'s Mot. for J. as a Matter of Law
(document no. 107) ("Pl.'s Resp.") at 5 (citing Jury Trial Day 5,
Jan. 27, 2009, Tr. at 2:10-13) (document no. 104).  Plaintiff
contends that defendant bases the pending Rule 50(b) motion not
on these two statements, but instead on "Kent's February 21, 2001
promise to personally compensate Schell for his expenses and
capital contribution."  See Pl.'s Resp. at 6 (citing Def.'s Mot
for J. as a Matter of Law (document no. 98)). ("Def.'s M.").
Plaintiff argues that because the February 21, 2001 promise to
pay is not the same alleged fraudulent statements identified at

16

the close of evidence in defendant's Rule 50(a) motion, defendant's Rule 50(b) motion should be denied.

I disagree with plaintiff's reading of the transcript and pending motion.  In the Rule 50(b) motion, defendant states that the allegedly fraudulent statements were:  "that Mr. Kent, in 2001, agreed to repay $47,524 and falsely represented (or impliedly represented) that Bradley Reed did not have the money at the time to pay Mr. Schell."  Def.'s M. at 5.  That sentence fairly summarizes the two statements identified by defense counsel when he made the Rule 50(a) motion at the close of evidence.  Additionally, at the close of plaintiff's case, defendant first asserted a Rule 50(a) motion, claiming there had been no evidence of fraud in emails or in financial statements, or any misrepresentation of an important fact to plaintiff.  See Jury Trial Day 3, Jan. 23, 2009, Tr. at 2:19–25, 3:2–7 & 13–23 (document no. 103).  While this argument did not focus on any particular statement or statements, but addressed the evidence generally, plaintiff countered that from 2000 through 2006, "Mr. Kent told Mr. Schell that the company had no money and that he was entitled to no money," id., Tr. at 5:1–4, and "that he would pay Mr. Schell, which we're going to present to the jury as an

act of misrepresentation intending to have Schell rely on it, as

he sells off the inventory that Mr. Schell has an interest in."

Id., Tr. at 5:12-16.   Those two statements are essentially the

same as the statements defendant identified as the bases for both

his Rule 50(a) and 50(b) motions.

The essence of the alleged fraud was that plaintiff was led

to believe there was no money to pay him when he left BRL in

February 2001 and that defendant would pay him as money came

available from the sale of assets, but defendant never did.   As

the court found in denying defendant's Rule 50(a) motion:

> This is a lawsuit for fraud. What was the
> fraud? . . . that the plaintiff said that
> there was money in the business, and in
> fact, [defendant] said that there was none,
> and that [defendant] was paying his expenses
> but not [plaintiff's].

Id., Tr. at 6:16-20.   The substance of the alleged fraud has not

changed, and defendant's motions for judgment as a matter of law

have challenged the same allegedly fraudulent statements.   See 9

Moore's, § 50.43[2] (technical precision not required when the

trial court is aware of the movant's position).   Defendant has

not based the pending Rule 50(b) motion on a "neoteric legal

theory," Diaz, 463 F.3d at 81, and plaintiff's claim that

defendant has is unavailing.

18

(a)  The Jury Verdict

Turning to the substance of defendant's motion for judgment as a matter of law, defendant has not carried his heavy burden of proving the evidence of fraud was insufficient.  To meet this burden, defendant must show that "reasonable persons could not have reached the conclusion that the jury embraced."  Sanchez v. P.R. Oil Co., 37 F.3d 712, 716 (1st Cir. 1994).

> We must examine the evidence in the light most favorable to plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion – that there is a total failure of evidence to prove plaintiff's case.

Vazquez–Valentin v. Santiago–Diaz, 385 F.3d 23, 29 (1st Cir. 2004).  In reviewing the evidence, the court "'may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence.'"  Sanchez, 37 F.3d at 716 (quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir. 1987)).

Defendant argues that the evidence does not show he defrauded plaintiff because (1) he did not misrepresent the financial condition of BRL when plaintiff left in 2001 because there was, in fact, no money or assets from which to pay plaintiff, as evidenced by the year end balance sheets and tax returns for 2000 and 2001, see Def.'s Exs. C, K & T; (2) that, at

19

that time, plaintiff knew there was no money, so plaintiff could
not have justifiably relied on the alleged misrepresentation
about available money to pay him; and (3) that defendant only
promised to pay plaintiff when BRL had the money to do so, which
is not a misstatement of material fact.  In short, defendant
submits the evidence showed that "by the end of 2000 and
thereafter, there were never sufficient funds to pay [BRL's]
current liabilities or to pay Mr. Myslik's loan," Def.'s M. at 8,
and his representation to plaintiff of that fact was true, not
fraudulent.  Defendant also submits that plaintiff knew this when
he left the company in 2001, so his claim is barred by the
statute of limitations.

Defendant misconstrues plaintiff's claim of fraud.  The
evidence showed, and plaintiff admits, that he understood the
Myslik debt was outstanding in February 2001 when he agreed to
stop working for BRL and that it held priority over his own
claims for repayment.  Plaintiff also admits that defendant's
promise in February 2001 to repay his expenses and capital
contributions as money became available gave rise to an oral
contract, which is barred by the statute of limitations.  Instead
plaintiff's fraud claim is that (1) defendant represented to him

that BRL did not have the funds to reimburse him, yet defendant was reimbursing himself; and (2) defendant repeatedly told plaintiff after his February 2001 departure that he would be paid as BRL lumber inventory was sold and money became available, yet inventory was sold and plaintiff was not repaid while defendant continued to pay himself.  See Pl's Resp. at 7.  Plaintiff contends he justifiably relied on defendant's misrepresentations about BRL's ability to pay throughout the disputed time period, and was strung along until discovery of BRL's financial records in the Myslik state court litigation exposed defendant's fraud.

    To uphold the jury's finding of fraud, I need only find some evidence that shows the jury's conclusion was reasonable.  See Vazquez–Valentin, 385 F.3d at 29 (upholding verdict unless there is a "total failure of evidence"); see also Coastal Fuels, Inc. v. Caribbean Petroleum, 79 F.3d 182, 188 (1st Cir. 1996) (reversing verdict only if the evidence "points so strongly and overwhelmingly in favor of [defendant], that a reasonable jury could not have arrived at a verdict for [plaintiff]").  The jury verdict reached here easily clears this very low evidentiary hurdle.  To begin with, plaintiff's reliance on defendant's word was justifiable, because the evidence showed that the parties had

a long, positive history together, which began with defendant as plaintiff's baseball coach, then mentor, employer and eventual business partner, and which created a solid basis for plaintiff's trust in defendant.  Next, it was clearly established by consistent testimony from both parties that defendant told plaintiff that as assets were sold and cash became available, plaintiff would be paid; yet the evidence showed that assets were sold and the Myslik debt was extinguished, freeing up cash, and plaintiff was never repaid while defendant continued to take money out of the company for himself.  Additional evidence which, in isolation perhaps may be innocently explained but when viewed in combination hints at more deceptive objectives, included the changing corporate forms, back-dating of agreements, co-mingling of funds, inability to explain entries in the general ledgers, and confusing testimony about the ownership and location of the critical lumber inventory.  This evidence readily supports the jury's finding that defendant defrauded plaintiff by deliberately manipulating BRL's corporate form and finances to advance his own self-interest and avoid repaying plaintiff.

The evidence of fraud included, but is not limited to, the following:

1.  In 2000, BRL had income from sales which
enabled defendant to pay himself expenses although he
told plaintiff there was no money, testified there
was no money, and in fact paid very little of plaintiff's
expenses.  See Pl's Exs. 6 & 22.  The 2000 General Ledger
shows sales to El Paso Anderson, Professional Forest,
Britton Lumber, Wickes Lumber, George Machino, Vermont
Wholesale, Gordon Brown and Gillies & Prittie, as well
as the fabled Maibec sale.  These sales substantiated
plaintiff's claim that he was busy working on sales other
than Maibec, which he explained was defendant's deal, and
undermined defendant's testimony that the company had no
money because plaintiff had botched the Maibec deal.

2.  In 2000, plaintiff contributed $28,837.93 to
BRL, see Pl.'s Ex. 6 at JKS1281, Ex. 23 at JKS2005,
& Ex. 52 at ¶ 3, and defendant contributed $32,200.00.
See Pl.'s Ex. 6 at JKS1282.  These documents undermined
defendant's testimony that he did not know what he had
contributed, but that he knew plaintiff had contributed
nothing, or next to nothing.  These documents also show
that the parties' capital contributions were not 1/3
plaintiff and 2/3 defendant, but were closer to 50/50 by
year end.  See id.

3.  In 2000 and 2001, defendant manipulated BRL's
corporate form from an LLC to a sole proprietorship
depending on which organizational structure most
expeditiously served his needs.  For example, defendant
relied on LLC debt prioritization rules to avoid paying
plaintiff while the Myslik debt was outstanding, yet
ignored those rules when he repaid himself over $67,000
in contributions he had made or loans he had given to
the company.  See Pl.'s Exs. 5 & 6.  Defendant also
testified that he relied on the LLC form to limit his
personal liability to plaintiff and other corporate
creditors, yet also admitted that he orchestrated the
voiding of the LLC structure in early 2001 to limit the
parties' potential tax liability and enable plaintiff
to be severed from the company.  See Pl.'s Exs. 2 & 9,
Def.'s Ex. H at LAND250-262, Trial Day 2, Jan. 22, 2009.

23

4.  In 2001 defendant treated BRL as a sole proprietorship and sold almost $98,000 in lumber, yet reported both business and personal income losses. See Pl.'s Ex. 20 & LAND238-39.  Defendant paid many expenses, including a "Cost of Goods Sold - Other" expense of more than $57,000 and sales commissions, see id., yet paid nothing on plaintiff's claims.

5.  In July 2001, Myslik sent defendant a demand letter to recover his loan to BRL.  At that time, Myslik told defendant he would set up a bank account in Maine to deposit proceeds from the sale of inventory through the summer.  See Pl.'s Ex. 12.  The next day defendant informed his attorney, Marc Lane, about this arrangement and his expectation that the "sale of about half our inventory will satisfy this obligation."  See Pl.'s Ex. 13.  Since the inventory was paid for and the company had only "about $25,000 in other obligations," defendant was optimistic about the business.  Defendant and Myslik agreed that Myslik would retain full control over BRL's receivables until $275,000 was paid, or, if by year end the loan was not paid down, the terms of the February 4, 2000 note would control again.  See id. & Pl.'s Ex. 14.

6.  The testimony was that the parties did not communicate in 2001, so plaintiff had no knowledge of this lockbox arrangement with Myslik.  The documents show that plaintiff contacted Myslik directly to get released from the February 4, 2000 note.  See Def.'s Exs. D & E.

7.  Although defendant testified that in March 2003 he and Myslik agreed to retroactively form a partnership effective January 1, 2002, and back-dated an agreement to December 15, 2001, both the documents and the progression of events undermine that testimony.  The Partnership Agreement between Myslik and defendant was dated December 15, 2001, and signed by both parties also on that date. See Def.'s Ex. G, Pl.'s Ex. 15.  That agreement provided that effective January 1, 2002, Myslik would convert his debt, totaling $234,000 into a 50% ownership position in BRL.  The terms and timing of this agreement, in December

2001, are consistent with Myslik having sold some inventory from July through December 2001, pursuant to the lockbox arrangement discussed <u>infra</u> ¶ 5, and reducing the debt from $275,000 to $234,000.  Most significantly, the agreement explicitly provided for how Myslik would control the inventory going forward:

> **"From January 1, 2002 until December 31, 2002, Edward Myslik may sell BRL inventory stored in Lewiston Maine, and may keep all proceeds of sales.  On December 31, 2002 EM will provide an accounting of the sales made by him and his capital contribution to BRL will be reduced by the sales amount.  Thereafter all BRL business will be transacted by BRL exclusively."**

<u>Id.</u>

8.  There is no evidence that plaintiff was informed of the Myslik debt being extinguished or, accordingly, his obligation on the Guarantee being released.  To the contrary, the evidence showed that plaintiff thought the Myslik debt was still outstanding and asked to see BRL's financials in September 2002.  <u>See</u> Pl.'s Ex. 24.  As plaintiff admitted to Myslik, "I can't quite wrap my mind around the specifics of a new relationship between you and me, and knowing where Kent stands would be very useful."  <u>Id.</u>

9.  Plaintiff testified that in September 2002 he called defendant and demanded payment.  A September 27, 2002 email exchange substantiates that testimony.  In it, defendant provided plaintiff with a partial explanation of the situation with Myslik.  <u>See</u> Pl.'s Ex. 25.  Although defendant told plaintiff Myslik had conducted himself towards BRL in a manner that should have invalidated the Guarantee and had spoken of capitalizing the debt into BRL equity, he declined to mention the December 15, 2001 Partnership Agreement that cancelled the debt.  He also misrepresented that he "believe[d] lumber owned by Bradley Reed has been sold by Ed as Sebago Lake property," <u>id.</u>, when in fact he knew he had agreed to Myslik selling BRL's

lumber stored in Maine to reduce Myslik's loan to BRL.
<u>See</u> Pl.'s Exs. 12, 13 & 15.

    10.  During 2002, defendant sold over $35,000 of
BRL inventory, without making any payments to plaintiff
or Myslik.  <u>See</u> Pl.'s Ex. 32, Def.'s Ex. T-2002 at LAND198.
The Profit & Loss statement for 2002 states that defendant
was paid $15,300, and that sales commissions of over $3,500
were paid, presumably to defendant since he testified that
he was running BRL in 2002, while Myslik was running his
own lumber company in Maine.  When put in context, that
testimony is consistent with the December 15, 2001,
Partnership Agreement that provided for Myslik, in 2002,
to keep the proceeds from sales of only that BRL lumber
that was stored in Maine for himself and to use the
proceeds from those sales to reduce his equity position
in BRL.

    11.  Consistent with the December 15, 2001 Partnership
Agreement, Myslik sold BRL lumber stored in Maine through
his company, Sebago Lake Lumber.  <u>See</u> Ex. 35 at TWK648.
Also consistent with that agreement, Myslik gave defendant
the required accounting on January 1, 2003.  <u>See</u> Def.'s
Ex. G at JKS0147.  Myslik wrote "the total income which
will reduce my capital contribution to Bradley Reed Lumber
LLC was $35,750."  <u>Id.</u>

    12.  At the end of 2002, Myslik's $234,00 equity in
BRL was reduced by the $35,750 he had earned from the sale
of the lumber stored in Maine.  Pursuant to the Partnership
Agreement, his equity position in BRL at that time would
have been approximately $200,000.  <u>See</u> Pl.'s Ex. 15.  That
valuation is substantiated by the several demands Myslik
made on defendant in December 2002 and early 2003, asking
for a settlement of $200,000.  <u>See</u> Def.'s Ex. F.  That
demand for payment, however, conflicts with the 2002 and
2003 BRL tax returns, which indicate the business was
operated as a partnership during that time, as provided
by the December 15, 2001 Partnership Agreement.
<u>See</u> Def.'s Ex. I.

    While these documents are confusing because there

should not have been any BRL note for Myslik to enforce
as a creditor when he was working with defendant as a
partner, in combination they support the inference that
defendant and Myslik were shifting their relative positions
to advance their individual financial interests.  In
particular, on January 13, 2003 when Myslik informed
defendant he needed to stop working in the business for
physical reasons, he offered to say the loan was never
late if it would help defendant and opined:

> **"The balance sheet issues can be easily resolved
> by forensic accounting.  I know God damn well
> that things will need to be unraveled and carefully
> studied no matter what the outcome is."**

Id. at JKS1347.

13.  In early 2003 when these negotiations were
transpiring between defendant and Myslik, plaintiff
still had not been paid and had no reason not to believe
that the original note and guaranty were still valid and
enforceable.  There was no evidence that he knew about the
arrangement between defendant and Myslik.  His ignorance
is validated by the documents which reflect Myslik and
defendant's evolving and amorphous business relationship,
discussed infra, ¶ 12.

14.  The evidence showed that on January 1, 2003,
the inventory was wholly owned by BRL, unencumbered by
Myslik's security interest.  Even if defendant's testimony
was accepted that the December 15, 2001 Partnership
Agreement was actually formed in March 2003 and back-dated,
pursuant to the terms of that agreement, Myslik had
converted "all BRL obligations to him to capital" and by
January 1, 2003, "Thomas Kent and Edward Myslik will share
equally in all profits, losses and other benefits that
normally accrue to members of the LLC."  Pl.'s Ex. 15.
Defendant testified that the inventory in Lewiston was
loaded on a tractor trailer and transferred to their joint
control in Littleton, NH, with 50/50 ownership between him
and Myslik.  That lumber was inventoried and valued at
$107,453.  See Pl.'s Ex. 38.  The evidence also showed

27

that checks were written on BRL's bank account during 2003, further supporting the conclusion that defendant was continuing the same lumber business, just in a different corporate form.  <u>See</u> Pl.'s Ex. 29.

15.  In July 2003, Ammoonoosuc Lumber Company was formed.  <u>See</u> Pl.'s Ex. 27.  Although defendant testified that he and Myslik were actively conducting the business of BRL Partnership together as Ammonoosuc Lumber, the Articles of Incorporation list of incorporators has Myslik's name scratched out and names only defendant.  <u>See</u> <u>id.</u>  The 2003 tax return reported the business as a partnership, and reported defendant received a guaranteed payment to partner of $10,245, plus other income.  <u>See</u> Def.'s Ex. I, Schedule K.

16.  Defendant testified that he told plaintiff he had formed a partnership with Myslik that was doing business as Ammonoosuc Lumber, and that the deal had eliminated the note and released them from the guaranty.  Defendant could not remember exactly when he told plaintiff this, but he remembered that plaintiff was very happy.  Plaintiff testified that defendant first called him with this news in 2003.  This is the first evidence that plaintiff understood his reimbursement claims could be paid, because the Myslik debt had been extinguished.  There was no evidence that plaintiff knew what the financial position of BRL was when he was told about the debt-equity swap partnership agreement with Myslik.

17.  Plaintiff testified that after this news, he periodically called defendant asking about when he could expect payment.  Defendant corroborated that testimony, but clarified that he told plaintiff he would only be repaid when the business made money and was in a position to do so, because it was a corporate, not his personal, liability.

18.  The 2003 General Ledger shows lots of assets being sold, yet plaintiff received no payments.  <u>See</u> Def.'s Ex. V.  During 2003, defendant received more than $19,000 in "loan payments," and Myslik was paid $14,400.

See Def.'s Ex. T-2003 at LAND149 & 151.

19.  Myslik abruptly left BRL in late 2003.  Defendant testified he did not know why Myslik left.  The evidence showed that Myslik left because he was "frustrated by Thomas Kent's repeated, unfulfilled promises to pay" and he "felt he could no longer trust" defendant.  See Def.'s Ex. P, ¶ 10.

20.  In April 2004, Myslik contacted BRL's long-time accountant, Peter Land, to inform Land the BRL partnership tax return was incorrect.  Land advised Myslik that the return was correct based on the documents he had received from defendant, including the December 15, 2001 Partnership Agreement, but that if Myslik had other information he should provide it and should file a corrected tax return. See Pl.'s Ex. 37 at LAND131.

21.  Immediately following Land's handwritten notes from his conversation with Myslik was another note written by Land, presumably from a follow up conversation he had with defendant.  See id. at LAND133.  It is part of the accountant's file for the 2003 tax returns, and states:

> **"Per TK – Ed [Myslik] shipped the balance of the unsold lumber to him in Littleton and abandoned the company – 2003 should be the final return as Ed has apparently resigned the partnership."**

22.  As reported on the BRL partnership tax return for 2003, the inventory's value at year end was $130,812. See Def.'s Ex. I at JKS1426.

23.  The evidence showed that by 2004, defendant was operating the lumber business as a sole proprietorship again, with the balance of the original inventory.  See Pl.'s Ex. 43, Schedule C.  In 2004, defendant opened a new bank account at Mascoma Savings Bank, for Ammonoosuc Lumber, but he testified that he used the account for both business and personal matters.  See Pl.'s Ex. 40. This co-mingling of funds was consistent other evidence that depicted a cavalier attitude about tracking the

finances of his business and the accounting of its
transactions.  Defendant testified his bookkeeper had
left at the end of 2002, so beginning in 2003 he "just
wrote checks" and "let the accountant figure it out."

24.  Defendant testified that he did not buy any
new lumber in 2004, that it was the same inventory that
had carried through all these corporate forms, but that
it was not BRL, LLC's lumber because the LLC had been
extinguished effective January 1, 2000.  This testimony
contradicted other evidence introduced at trial, of
testimony defendant had given at a January 2005 deposition,
when he stated that the lumber sold through Ammonoosuc
was BRL's inventory.  The documentary evidence cited
infra, ¶¶ 14 &21, also contradicts defendant's trial
testimony, by showing the inventory that originally
belonged to BRL was the same inventory defendant was
selling in 2004.

25.  In September 2004, Myslik sued plaintiff and
defendant on the original debt, and reached a settlement
with both parties independently.  Regardless of the merits
of Myslik's claims, the lawsuit and settlement raised the
significant question of why defendant had not cancelled
the note and voided the security instruments when the
Partnership Agreement was executed, particularly in
light of the testimony that the Myslik debt had saddled
the business for years.  While the evidence provided no
answer to this question, the conundrum of what defendant's
deal with Myslik really was further bolstered plaintiff's
theory of fraud and deception.

This chronology highlighting defendant's failure to be

forthright with plaintiff about the sale of inventory and BRL's

ability to repay his financial contributions to the company

readily supports the conclusion that defendant defrauded

plaintiff.  It also demonstrates the reasonableness of the jury's

determination that plaintiff could not have discovered the fraud until sometime after November 17, 2003.  There simply is not "a complete failure of evidence" to support the verdict, but rather a substantial amount of evidence on which a reasonable jury could base a finding of fraud.  The jury's verdict for plaintiff on his fraud claim shall be upheld, and defendant's motion for judgment as a matter of law is denied.

> (b)   The Damage Award

In the alternative, defendant argues for a new trial under Rule 59.  A motion to alter or amend a judgment, <u>see</u> Fed. R. Civ. P. 59, may only be granted if "the verdict is against the demonstrable weight of the credible evidence or results in a blatant miscarriage of justice."  <u>Sanchez</u>, 37 F.3d at 717. Defendant argues that the jury award erroneously includes the $29,000 plaintiff paid Myslik to settle Myslik's state court claims against plaintiff, which defendant cannot be held liable for because that "payment was not claimed to be a result of Mr. Kent's alleged fraud."  Def.'s M. at 15.

If the court finds that the jury's verdict is excessive, it may order a new trial, or it may reduce the verdict and avoid a new trial by obtaining the plaintiff's acceptance of the reduced

damage award.  <u>See</u> 12 <u>Moore's</u> § 59.13[2][g][iii] at 59-83; <u>see</u>
<u>also</u> <u>Franceschi v. Hosp. Gen. San Carlos, Inc.</u>, 420 F.3d 1, 5
(1st Cir. 2005) (reducing awards not rationally based on the
evidence that are "grossly excessive, inordinate, shocking to the
conscience of the court").  A remittur, as this process is
called, enables the court to reduce a damage award which "after
weighing all the evidence and other relevant factors. . . is
against the clear weight of the evidence or otherwise results in
a miscarriage of justice."  12 <u>Moore's</u> § 59.13[2][g][iii] at 59-
84.  If certain identifiable sums should not be included in the
jury's verdict as a matter of law, the rules allow the court to
reduce the award in some circumstances even without obtaining the
plaintiff's agreement.  <u>See</u> <u>id.</u>

     Defendant persuasively argues the damage award includes the
$29,000 payment plaintiff made to Myslik.  The damages awarded
were $76,524.93, which is the exact sum total of plaintiff's
capital contributions ($28,937.93), plus his expenses
($18,587.00), plus his Myslik settlement payment ($29,000).
These figures were in evidence, and plaintiff's counsel
specifically recommended the jury look at defendant's admissions
for guidance in determining damages.  <u>See</u> Pl.'s Exs. 48 & 51;

Jury Trial Day 4, Jan. 26, 2009, Tr. at 193-94.  While we do not
know how the jury calculated the damage award, the sum is a
remarkable coincidence.

At summary judgment, I found that an Indemnification
Agreement made defendant liable for 2/3 of the damages plaintiff
sustained in connection with Myslik's claims on the Guarantee
that secured Myslik's original loan to BRL.  See infra, § 1.  I
explicitly found, however, that plaintiff's settlement payment to
Myslik was not covered by the Indemnification Agreement because
claims on the Guarantee had been dismissed, and plaintiff's
settlement payment stemmed from his separate obligations under
the U.C.C. on the promissory note.  See Sum. J. Order at 11 n.3.
Defendant now seems to argue that because defendant was not
liable under the Indemnification Agreement for that $29,000
payment, the jury's verdict is based on a manifest error of law.[4]

Defendant is correct that the $29,000 paid to Myslik could
not be awarded as damages for the indemnification claims asserted

---

[4]Defendant erroneously submits "This Court confirmed the
mathematically correct amount [of damages (presumably)] in its
prior orders."  Def.'s M. at 15.  While the Summ. J. Order
identifies what portions of plaintiff's claims asserted in Counts
I and II were covered by the Indemnification Agreement and
recoverable as damages, the order neither considered nor ruled on
plaintiff's fraud claims asserted in Count IV that were tried to
the jury and are at issue here.

in counts I and II and discussed _infra_, § 1.  The amount may be awarded, however, as compensation for the fraud defendant committed.  As discussed at length above, the evidence supports the jury's conclusion that over the course of several years, defendant misrepresented BRL's ability to satisfy its debt obligations with its current assets.  Plaintiff relied on defendant's representations about the company's financial position, and did not know definitively whether defendant had managed to extinguish the Myslik debt or release him from the Guarantee.  The evidence conflicted about the effectiveness of the Myslik-Kent Partnership Agreement, and the fact that Myslik had stated a claim under the U.C.C. on the promissory note against plaintiff gives rise to the inference that, in 2006 when plaintiff settled the claim, he believed the note had not been cancelled.  It was reasonable for the jury to conclude that plaintiff settled the Myslik suit because he had been defrauded by defendant about what Myslik's rights against him were and thought he was still liable on the original promissory note.

"Except in those cases in which it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there, the court may not arbitrarily reduce

34

the amount of damages, for to do so would deprive the parties of their constitutional right to a jury."  11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, <u>Fed. Prac. & Proc. Civ. 2d</u> § 2815 at 159 (2d ed. 1995).  I cannot conclude that the $29,000 should not have been included as a matter of law.  The evidence showed that defendant settled Myslik's claims against him for "essentially nothing.  We agreed to divide the Wildwood lumber." <u>See</u> Def.'s Ex. Q at 2.[5]  The evidence also showed that Myslik's role at BRL was recast many times throughout the contested period and gave rise to the reasonable inference that his elusive and uncertain status with the company was not unintentional.  The jury reasonably could have determined that defendant deliberately created a conflicting and confusing documentary trail of BRL's business activity and identity to hide assets and avoid paying creditors, including both plaintiff and Myslik.  Based on the evidence of fraud adduced at trial and discussed above, the jury's finding that part of the damages plaintiff sustained from defendant's fraud included the money he paid Myslik cannot be

---

[5]This statement is even more significant because it is from Myslik's second affidavit, made on November 6, 2008 at defendant's request and given specifically to refute Myslik's August 31, 2007 affidavit given to plaintiff, allegedly under some duress.  <u>Cf.</u> Def.'s Ex. Q & Pl.'s Ex. 52.

considered legally incorrect.  The verdict is not against the weight of the evidence, and defendant's motion, in the alternative for a new trial under Rule 59, is denied.

**4.  Plaintiff's Motion for Determination of the Amount of Attorney's Fees to be Awarded under the Jury Verdict (document no. 101)**

Plaintiff has submitted a claim for $139,703.50 in attorneys fees.  Defendant does not object to the hourly rate, nor to specific time entries.  However, whether one looks to New Hampshire or federal law, defendant correctly notes that plaintiff must, but has not, made any effort to allocate fees among his various claims.  His jury success at trial for attorney's fees was only on his fraud claim.  "Where a party prevails upon some claims and not others, and the successful and unsuccessful claims are analytically severable, any fee award should be reduced to exclude time spent on unsuccessful claims." LaMontague Builders, Inc. v. Brooks, 154 N.H. 252, 261, 910 A.2d 1162, 1169 (2006).

Since counsel has not provided any allocation, he must do so within ten (10) days of the date of this order.  Counsel is ordered to review the time records and allocate just those fees attributable just to the fraud claim.  In addition, where the

entry relates to more than one entry, he is to allocate it.  No allowance is to be given for entries on claims attributable to non-fraud claims.  Where the entry is insufficient to identify which, if any, claim is involved, no fees are to be sought and no more will be awarded.  No fees are to be awarded for entries after the jury verdict.  Duplicative fees are to be deleted. Plaintiff is to eliminate all fees attributable to summary judgment matters.

Defendant will have ten (10) days to respond to the filing.

Conclusion

For the reasons set forth above, the pending motions are disposed of as follows:

1)  Plaintiff's motion for partial award of attorney's fees (document no. 81), GRANTED.  Plaintiff is awarded $21,288.32;

2)  Plaintiff's claim for unjust enrichment (Count III of the Complaint), DENIED;

3)  Defendant's motion for judgment as a matter of law or, in the alternative, for a new trial (document no 98), DENIED;

4)  Plaintiff's motion for determination of the amount of attorney's fees to be awarded under the jury's verdict (document no. 101), DENIED as submitted.  Plaintiff shall refile his

request for attorney's fees within ten (10) days of the date of
this order.  Defendant shall have ten (10) days to respond to
plaintiff's request.  Failure to abide by these time deadlines
will result in non-consideration of the untimely filing.

**SO ORDERED.**


_____
James R. Muirhead
United States Magistrate Judge

Date: April 6, 2009

cc:   David A. Strock, Esq.
      Melinda J. Caterine, Esq.
      K. William Clauson, Esq.